United States Court of Appeals
For the First Circuit


No. 96-1245

STEPHEN R. MARQUES,

Plaintiff, Appellant,

v.

KEVIN J. FITZGERALD,

Defendant, Appellee.


APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge] 



Before

Torruella, Chief Judge, 

Coffin, Senior Circuit Judge, 

and Tauro,* District Judge. 



Thomas S. Brown with whom Stephen A. Rodio was on brief for 
appellant.
Kathleen M. Powers with whom Marc DeSisto was on brief for 
appellee.



October 28, 1996


 

*Of the District of Massachusetts, sitting by designation.

COFFIN, Senior Circuit Judge. This case concerns several 

claims brought by plaintiff-appellant, Stephen R. Marques,

against the city of East Providence, Rhode Island, based on his

discharge while a probationary employee of the city. Marques,

who had refused to continue a work assignment on a boat at a city

pond due to his fear of capsizing and was subsequently

terminated, sued the city under both state and federal law; the

city removed the case to federal court. The district court

granted directed verdicts for the city on all claims. We affirm

on two claims, and vacate as to Marques' claim under the Rhode

Island Whistleblowers' Act. 

BACKGROUND

Marques was hired as a laborer by the city of East

Providence in June 1993.1 On December 22, 1993, several days

before the expiration of his six-month probationary period,

Marques was assigned to work at Jones Pond, cutting weeds in the

pond from an aluminum row boat. Marques, who is unable to swim,

expressed some concerns about the assignment to Gregory Gammell

("Gammell"), the Superintendent of the Parks Department, but was

told by Gammell not to worry about it. On his arrival at Jones

Pond, Marques noticed that there were no life preservers in the

boat, and asked Gammell for one. Gammell initially questioned

Marques' need for the life preserver, but told him he would get

 

1 We take the facts from the pleadings and from the
testimony at trial. See PHC, Inc. v. Pioneer Healthcare, Inc., 
75 F.3d 75, 77 (1st Cir. 1996).

-2-

one; however, this life preserver was not forthcoming.2 Marques

nevertheless performed the assignment.

On the following day, December 23, 1993, Marques, who had

again been assigned to duty in the boat cutting reeds, told lead

worker Robert Barlow ("Barlow") that he was nervous about working

in the boat, that he would like a life preserver, and that he had

asked for one on the prior day but not received it. Barlow

questioned the need for a life preserver, given the depth of the

water, but said he would call Gammell. Gammell arrived, but sans

life preserver, and subsequently left the site. Marques

testified that he began to feel nauseous during the morning while

working on the boat, which he attributed to motion sickness. At

the morning break, he therefore told Barlow that he wasn't going

back in the boat because he was feeling sick. Barlow indicated

that if Marques didn't return to the boat, Barlow would call

Gammell. During subsequent general conversation between workers

at the pond site about the safety of the project, Marques and

others expressed concerns about the lack of life preservers and

other safety devices. Gammell returned to the pond, and
 

2 Testimony was presented by city witnesses at trial
indicating that the depth of Jones Pond varied between two and
five feet. The Pond was created artificially by dredging, and
measures approximately 300 feet by 250 feet, with retaining
cement walls. We also note that Paul Lemont, the City Manager of
East Providence, who gave the original order for the work project
at Jones Pond, testified that the weed cutting project could have
been performed by laborers in a boat, as actually occurred, or
alternatively by laborers wearing boots. 
On the other hand, Marques testified that at one point
during the December 23rd session, he lost hold of a five foot
rake he was using; when he grabbed it, the rake was almost fully
submerged in the water, and had not yet touched bottom. 

-3-

instructed Marques and Barlow to get in his car. On their

arrival at Gammell's office, Gammell instructed Marques to "punch

out" and then terminated him.3 Marques did not discuss his

safety concerns with Gammell during the car trip or at his

termination. Gammell informed Marques that he was being

terminated because he wouldn't get back in the boat and because

of his attitude. 

Marques subsequently met with City Manager Lemont to discuss

his firing. At this meeting, Marques explained his concerns

about safety and his physical ills to Lemont; however, Lemont

later wrote Marques a letter informing him that the decision to

terminate Marques would stand.

Shortly after his termination, Marques began experiencing

physical symptoms such as tightness in his chest and difficulty

breathing, which his physician attributed to situational anxiety

brought on by his firing. His doctor prescribed medications and

counseling. Marques also began experiencing marital

difficulties. 

Marques sued the city in state court, alleging violations of

a number of state statutes, including the Rhode Island

Whistleblowers' Act, as well as federal claims including the

Americans with Disabilities Act. He also claimed that the city's

actions constituted negligent or intentional infliction of

emotional distress, and that the city had violated the Rhode
 

3 During the probationary period, city employees could be
fired for any reason, with or without cause, and also could not
file a grievance with the city regarding a discharge.

-4-

Island Regulation of Boats law.4 The city removed the case to

federal court on the basis of federal question jurisdiction. At

the close of the evidence, the district court granted a directed

verdict for the city on all counts.5 This appeal on three of

the claims followed. 

DISCUSSION

Our review of the directed verdicts on the appealed claims

is plenary; as such we must apply the same criteria used by the

district court, with all proof and inferences reasonably drawn

therefrom viewed in the light most favorable to the non-movant. 

Gibson v. City of Cranston, 37 F.3d 731, 735 (1st Cir. 1994). To 

affirm, we must find that the evidence on each count would permit

thoughtful factfinders to reach but one conclusion. Fashion 

House v. K Mart Corp., 892 F.2d 1076, 1088 (1st Cir. 1989).  

After a thorough review of the record, we affirm the district

court on the intentional infliction of emotional distress and

 

4 The specific statutes under which Marques' claims were
brought are as follows: the Rhode Island Whistleblowers' Act
(R.I. Gen. Laws 28-50-1 - 9); the Americans With Disabilities
Act (on the grounds that the city saw him as disabled) (42 U.S.C.
12100 et seq.); the Rhode Island Fair Employment Practices Act
(R.I. Gen. Laws 28-50-1 - 28-50-9); the Rhode Island Civil
Rights Act (R.I. Gen. Laws 42-112-1 et seq.); and Rhode
Island's Regulation of Boats law (R.I. Gen. Laws 46-22-1 - 19).

5 Marques voluntarily dismissed a claim that the city's
actions violated Rhode Island's safe boating practices public
policy. After the trial court had granted directed verdicts on
all the other claims, Marques moved to reinstate this count;
however, the district court denied this motion. We need not
address this issue because appellant did not brief it. See 
Playboy Enterprises, Inc. v. Public Service Com'n of Puerto Rico, 
906 F.2d 25, 40 (1990) (appellant waives any issue not adequately
raised in initial brief).

-5-

Rhode Island Regulation of Boats claims, but vacate on the

appellant's claim under the Rhode Island Whistleblowers' Act. We

deal first with the most significant claim.

A. Rhode Island Whistleblowers' Act Claim 

The Rhode Island Whistleblowers' Act provides in relevant

part that:

An employer shall not discharge, threaten, or
otherwise discriminate against an employee regarding
the employee's compensation, terms, location, or
privileges of employment
(1) because the employee [...] reports or is
about to report to a public body, verbally or in
writing, a violation which the employee knows or
reasonably believes has occurred or is about to occur,
of a law or regulation, or rule promulgated under the
law of this state, a political subdivision of this
state, or the United States, unless the employee knows
or has reason to know that the report is false....6

Accordingly, an employee must demonstrate that there was a causal

connection between the report and the termination.

The statute does not explicitly define what constitutes a

"report" or "reporting" a suspected or known violation. However,

it does define "public body" as follows:

(4) "Public body" means all of the
following:[...]
(iii) A county, city, town, or regional governing
body, a council, school district, or a board,
department, commission, agency, or any member or
employee thereof.7

 

6 R.I. Gen. Laws 28-50-3(1) (1995). The current Rhode
Island Whistleblowers' Act was enacted in 1995, and replaced an
earlier version of the Whistleblowers' Act that carried a
different statutory number, (R.I. Gen. Laws 36-15-1 - 10);
however, the terms of this section were unchanged. 

7 R.I. Gen. Laws 28-50-2(4)(iii) (1995).

-6-

The district court concluded that this statute is

inapplicable in the circumstances of this case because Marques'

statements could not be construed as "reports" to a "public

body." The district court reasoned that the statute contemplates

a situation in which an employee reports or threatens to report a

violation of a law to a third party with jurisdiction over the

violation. For the district court, Marques' statements were

merely explanations for his refusal to return to the boat, rather

than reports to an appropriate individual or body of known or

suspected violations. 

Marques argues on appeal that the district court gave an

overly narrow interpretation to the statute's provisions. He

claims that his statements to Barlow could fall within the

statute and that both caselaw (albeit from other jurisdictions)

and public policy support his view. The city, on the other hand,

contends that the district court properly construed the

provision; it maintains that Marques made no statements to Barlow

or other supervisors that reasonably could be construed as

reports of violations to a public body. 

Our task is complicated by the lack of guideposts. There is

no relevant legislative history indicating the intent of Rhode

Island lawmakers concerning the interpretation of these terms. 

Furthermore, Rhode Island courts have not directly interpreted

"report" or "public body" under the statute. We do, however,

have the statutory language, which must be construed consistently

with its purpose. Our review of the language of the statute,

-7-

together with an examination of similar statutes from other

jurisdictions, with an eye to the public policy underlying such

whistleblowers' statutes, counsels a broader view of the statute

than that adopted by the district court. 

We begin with principles of statutory construction. Where

the terms of a statute are clear, a court must give the words

their plain and obvious meaning. See Ellis v. Rhode Island 

Public Transit Authority, 586 A.2d 1055, 57 (R.I. 1991); 

O'Connell v. Shalala, 79 F.3d 170, 176 (1st Cir. 1996) (courts 

are bound to give statutes a practical, commonsense reading). 

Furthermore, a statute may not be construed in a manner that

results in absurdities or defeats its underlying purpose. In re 

Falstaff Brewing Corp., 637 A.2d 1047, 1050 (R.I. 1994). As 

noted, the statute explicitly includes municipal employees in the

definition of "public body"; however, the boundaries of the

definition of "report" are still unclear. Therefore, we turn to

Rhode Island's sister states in search of further clarification.8

Similar whistleblowers' statutes are found in Massachusetts,

Maine, New Hampshire, and Connecticut. Of these, the Connecticut

statute bears the closest resemblance to the Rhode Island statute

at hand, although it, too, has not been the focus of relevant

caselaw.9 Generally, these whistleblowers' statutes appear to
 

8 We look first to those states within our own circuit,
and then to the state (Connecticut) with the statute that most
resembles the one at issue here. 

9 Conn. Gen. Stat. Ann. 31-51m (West 1987)("No
employer shall discharge, discipline, or otherwise penalize any

-8-

fall into two broad categories: statutes like Rhode Island's and

Connecticut's, which are broadly drafted, and do not explicitly

include statements to an employee's supervisor within the rubric

of reports to a public body, and more detailed statutes like

those of Massachusetts, Maine and New Hampshire. The statutes in

this second category are considerably more complex than those of

the first type; these explicitly include statements to a

supervisor within protected behavior, and indeed, require it as a

preliminary reporting step.10 Clearly, under this type of

statute, Marques' statements to Barlow would come under the

umbrella of protected actions. Such is not as clearly the case

here, where we must deal with a more broadly drafted statute. 

Marques, confronted with a paucity of Rhode Island

authorities on this issue, points to two cases from other

jurisdictions dealing with whistleblowers to support his

assertion that public policy supports a broad reading of the

Rhode Island Whistleblowers' Act. Appeal of Bio Energy Corp., 

607 A.2d 606 (N.H. 1992), concerned an employee who was

terminated after bringing to her supervisor's attention a
 

employee because the employee ... reports, verbally or in
writing, a violation or a suspected violation of any state or
federal law or regulation or any municipal ordinance or
regulation to a public body ...."). 

10 See, e.g., N.H. Rev. Stat. Ann. 275-E (1987 & Supp. 
1995) ("[the protections of this section] shall not apply to any
employee unless the employee first brought the alleged violation
to the attention of a person having supervisory authority with
the employer, and then allowed the employer a reasonable
opportunity to correct that violation...."); Mass. Gen. L. ch.
149, 185(b)(1) et seq. (West 1996); Me. Rev. Stat. Ann. tit. 26
831(1) - 833(2) (West 1988).

-9-

violation of State Department of Labor rules regarding payment of

wages. Id. at 607. The court there found that the New Hampshire 

statute, which mandates an initial report to a supervisor,

applies to employees from the point of this initial report. Id. 

at 608-09. The court noted the dual purposes of the New

Hampshire Act: "to encourage employees to come forward and

report violations without fear of losing their jobs and to ensure

that as many alleged violations as possible are resolved

informally within the workplace." Id. at 609. Similar purposes, 

Marques argues, undergird the Rhode Island statute. The city,

however, distinguishes Bio Energy from our case on the grounds 

that the Rhode Island statute, unlike the New Hampshire one, does

not contain specific language including supervisors within the

group to whom reports may be made, and that no intent to do so

should be inferred. 

Bechtel Construction Co. v. Labor Sec'y, 50 F.3d 926, 931-32 

(11th Cir. 1995), concerned an internal complaint made pursuant

to the whistleblowers' provisions of the Energy Reorganization

Act, rather than to a state whistleblowers' Act. There, the

court broadly construed the Act's terms (which prohibited

discharging or discriminating against employees who assisted with

or participated in "proceedings") to encompass the actions of an

employee who called violations of procedures for handling

radiation-contaminated tools at a nuclear power plant to the

-10-

attention of his supervisor. Id. at 931-32.11 Marques argues 

that public policy counsels a similarly broad reading of the

Rhode Island statute. The city, however, maintains that the

Energy Reorganization Act's inclusion of the "catchall" phrase

"or any other action" at the end of the whistleblowers' section

in question indicated an intent not present in the Rhode Island

statute to extend the protections afforded employees beyond

"proceedings" to include internal complaints. 

As the whistleblowers' provisions at issue in Bechtel do not 

mirror those at issue in this case, the comparison of the Rhode

Island Whistleblowers' Act to the Energy Reorganization Act,

while informative, is not dispositive. But, we take from both

this case and Bio Energy an important and applicable public 

policy consideration -- that employees should not be discouraged

from reporting suspected violations initially to supervisors. We

see no significant policy served by extending whistleblower

protection only to those who carry a complaint beyond the

institutional wall, denying it to the employee who seeks to

improve operations from within the organization. The latter

course appears to us as more likely to lead to prompt resolution

of issues related to suspected violations of laws or regulations.

 

11 The court partially based this finding on the fact that
whistleblowers' provisions in other regulations such as the Clean
Air Act and the Federal Water Pollution Control Act have been
deemed to include internal complaints. Bechtel, 50 F.3d at 932. 
The court also noted that deference is given to administrative
interpretation of regulations under Chevron v. Natural Resources 
Defense Counsel, Inc., 467 U.S. 837, 104 S. Ct. 2778 (1984). 

-11-

We therefore conclude that a jury permissibly could find the

Rhode Island Whistleblowers' Act applicable to statements made by

an employee to a supervisor concerning known or suspected

violations of the law. The terms of the statute specifically

define a "public body" as including "[a]...city...governing

body...or any...employee thereof." We do not read this language

as covering all municipal employees, such as a co-worker, but as

including a superior charged with carrying out the policies and

decisions of the city. While the Act does not explicitly address

statements to supervisors, as do other states' whistleblowers'

statutes, the public policy behind these statutes is surely

similar: to encourage the prompt reporting and early, amicable

resolution of potentially dangerous workplace situations, and to

protect those employees who do report such violations from

retaliatory action by employers. 

We do not, of course, hold that a verdict for Marques is

therefore mandated; the jury must decide whether the statements

he made fall under a more expansive reading of the statute than

that allowed by the district court, and then whether Marques was

actually fired as a result of his statements to Barlow. However,

we think that the question of whether Marques' statements bring

him within the protection of the Rhode Island Whistleblowers' Act

was one for the jury, and not a proper subject for a directed

verdict. 

Marques raised concerns about the project twice with Gammell

on December 22nd: first, when he initially received the

-12-

assignment to work in the boat on Jones Pond, and then again, at

the Pond, where he fruitlessly asked Gammell for a life

preserver. Furthermore, Marques testified on direct examination

that on December 23rd, after the morning break, he told Barlow he

did not want to go back in the boat because he felt sick, that he

did not feel conditions in the pond were safe, and that he still

had not gotten a life preserver. On cross examination, Marques

again testified that he had told Barlow he was not feeling well,

that he was not going back in the boat, and that during general

conversation on the shore, he and others discussed the safety of

the project. Moreover, as we have observed in note 2, supra, the 

evidence of the depth of the pond was not so clear that Marques'

fear was completely unfounded. We do not feel that a reasoned

factfinder could have reached but one conclusion on the issue

whether these statements constituted a report of a violation

covered by the Rhode Island Act and whether Marques' termination

was the result of his statements.

Accordingly, we vacate the directed verdict on the Rhode Island

Whistleblowers' Act claim and remand it for retrial.

B. Negligent/Intentional Infliction of Emotional Distress Claim 

Marques also appeals the district court's grant of a

directed verdict for the city on his claim that the city's

actions either negligently or intentionally caused him emotional

distress. Under Rhode Island law, a plaintiff, to succeed, must

show that 1) the defendant's conduct was intentional or in

reckless disregard of the probability of causing emotional

-13-

distress, 2) the conduct was extreme and outrageous, 3) there was

a causal connection between the wrongful conduct and the

emotional distress, and 4) the emotional distress in question was

severe. See Champlin v. Washington Trust Co., 478 A.2d 985, 989 

(R.I. 1984) (adopting standard of Restatement (Second) of Torts  

46). Additionally, Rhode Island requires a physical

manifestation of the emotional distress. Id. at 990. The 

district court rejected this claim on the ground that the

evidence presented was insufficient to warrant a finding that the

city's actions in terminating Marques were extreme and

outrageous.12 We agree. While being terminated several days shy

of the end of his probation period may not have been pleasant for

Marques, we do not believe that a jury would properly have found

on the evidence presented that the conduct of Barlow, Gammell,

and Lemont was sufficient to make an "average member of the

community ... exclaim 'Outrageous'." Borden v. Paul Revere Life 

Ins. Co., 935 F.2d 370, 380 (1st Cir. 1991) (quoting Restatement 

(Second) of Torts 46, comment (d)).13  
 

12 In assessing whether conduct is extreme and outrageous,
Rhode Island courts have used three factors: 1) the conduct
itself; 2) the particular relationship of the parties; and 3) the
known or knowable susceptibility of the plaintiff to the
emotional injury. Russell v. Salve Regina College, 649 F. Supp. 
391, 401 (D.R.I. 1986), aff'd, 890 F.2d 484 (R.I. 1989). 

13 Both parties note that in Moniodis v. Cook, 494 A.2d 
212 (Md. 1985), the court found an employee who was discharged
after her refusal to submit to a polygraph test stated a
colorable claim for intentional infliction of emotional distress
on the grounds that the employer's actions were extreme and
outrageous because the employer knew the employee was dedicated
to her work, that she had a pre-existing nervous condition, and
she was emotionally debilitated as a result of the termination.

-14-

C. Rhode Island Boating Law 

Finally, Marques appeals the directed verdict on the Rhode

Island Boating Laws claim. 

R.I. Gen. Laws 46-22-15 provides that 

the owner of a vessel shall be liable for any injury or
damage occasioned by the negligent operation of the
vessel, whether the negligence consists of a violation
of the provisions of the statutes of this state, or
neglecting to observe such ordinary care and such
operation as the rules of the common law require.

This statute therefore requires "negligent operation" of a

vessel and that a plaintiff's injuries be proximately caused by

this negligent operation. Even were negligent operation of the

boat in question to be found, as to which we express some doubt,

this claim would nevertheless founder on the proximate cause

requirement: the connection between Marques' injuries, including

his discharge and resulting alleged damages, and the city's

operation of the boat on Jones Pond is too attenuated. We

therefore affirm the district court's ruling on this claim too. 

CONCLUSION

The Rhode Island Whistleblowers' Act properly may be

construed to encompass statements made by an employee to a

supervisor concerning known or suspected violations of the law. 

This accords with the terms of the statute itself, and with the

public policies underlying this type of statute. As a jury could

have inferred that Marques' statements to Barlow constituted such

 

We find the facts of that case as they related to the employer's
actions clearly distinguishable in nature and degree from those
alleged here. 

-15-

"reports" to a "public body" under this broader construction of

the statute, and that he was fired as a result of these

statements, we vacate the district court's directed verdict on

this claim. However, we affirm the district court's judgments on

the negligent/intentional infliction of emotional distress claim

and on the violation of the Rhode Island Boating Safety Act

claim. 

Affirmed in part and vacated and remanded in part. One half 

costs to appellant. 

-16-