Department of Labor
No. 2005-529

APPEAL OF ALAN HARDY
(New Hampshire Department of Labor)

Argued: September 13, 2006
Opinion Issued: February 21, 2007

*Backus, Meyer, Solomon & Branch, LLP*, of Manchester (*Jon Meyer* on the brief and orally), for the petitioner.

*Hebert & Uchida, P.L.L.C.*, of Concord (*Donald F. Hebert* on the brief and orally), for the respondent.

BRODERICK, C.J. The petitioner, Alan Hardy, appeals a decision of the New Hampshire Department of Labor (DOL) that it did not have statutory authority to award him attorney's fees and expenses for his successful Whistleblowers' Protection Act claim, see RSA chapter 275-E (1999 & Supp. 2006). The respondent, the Hopkinton State Fair Association (Association), cross-appeals the DOL's ruling that Hardy met his initial burden of persuasion on the merits of his claim. We dismiss the Association's cross-appeal, reverse the DOL's ruling on attorney's fees and remand.

I

The record and the decision of the hearing officer support the following. The Association administers the annual Hopkinton State Fair (Fair) and supports other seasonal businesses and events that are held at the Hopkinton Fair Grounds, but produced by other organizations. The Association is run by a board of directors (board), on which Hardy served from 1987 to 1991. In 1991, he was hired as the general manager of the Association. As such, he was the Association's only full-time employee, responsible for the supervision of 200-300 seasonal employees and contractors. Hardy's employment history with the Association does not indicate any significant issues or problems; his only annual performance review in 2003 repeatedly used the term "above average" to describe his job performance.

As a charitable trust, the Association is subject to RSA 7:19-a (2003), which provides that "[e]very charitable trust shall adopt policies pertaining to pecuniary benefit transactions and conflicts of interest." RSA 7:19-a, IV. "Pecuniary benefit transactions" include those in which a director of the charitable trust has a direct or indirect financial interest. See RSA 7:19-a, I(c). Indirect financial interests arise in transactions involving members of the board and members of their immediate families. See RSA 7:19-a, I(b). The statute requires the Association to maintain a list of all pecuniary benefit transactions and annually report the list to the director of charitable trusts. See RSA 7:19-a, II(c). In addition, all such transactions must receive a two-thirds vote of the disinterested members of the board who comprise a quorum, and the Association must publish in a newspaper of general circulation a notice of any pecuniary benefit transactions equaling $5,000 or more. See RSA 7:19-a, II(b) and (d).

The Association did not comply with these statutory requirements. At the DOL hearing, Hardy testified that during the course of his employment, he fielded inquiries from board members about securing employment for family members and that by 2004, ten of the eleven board members had a direct or indirect financial interest in the Fair.

In 1997, Hardy began to work with the board to adopt a "conflict-of-interest policy," but the board was not responsive. In 2003, the Association's auditor expressed her concern to Hardy about the Association's failure to comply with RSA 7:19-a. Hardy communicated his concerns to the Association's attorney. Hardy's efforts to persuade the board to require individual board members to disclose pecuniary benefit transactions and to generate a policy detailing how the Association would comply with the statute, however, met with virtually no success.

On November 8, 2004, Hardy sent an email to the office of charitable trusts expressing concern about the Association's noncompliance with RSA 7:19-a. Hardy detailed that he had been trying to work with the board on two issues—statutory compliance on pecuniary benefit transactions and the number of disinterested directors on the board. He closed his email by stating:

> I believe that the need for my Board of Directors to have a conflict of interest policy and to follow it is now more important than ever.
>
> I guess at this point, I am asking for your advice as I cannot come up with a solution which complies with [RSA] 7:19-a.

That same day, Hardy gave a copy of his email to David Jones, the board's president, for inclusion with the packet of documents to be given to the entire board at its meeting that evening. In a cover memorandum, Hardy wrote:

> It is now more important than ever that there be a conflict of interest policy established and working. You can see that there are new requirements for non-profits who have more than 1 Million in gross income. I have also asked the Department of Justice for guidance regarding [RSA] 7:19-a compliance. This process needs to be complete as part of this years [*sic*] filing under the new statute enacted this last summer.

Jones testified that he distributed both Hardy's email and cover memorandum to the other members of the board.

By a letter dated November 10, 2004, the board notified Hardy "that the position known as The Hopkinton State Fair General Manager has been eliminated." Jones also testified that, prior to the November 8 meeting, no consideration had been given to eliminating the general manager position, and that Hardy's report to the Attorney General "disturbed" him and had a "small part" to play in the elimination of Hardy's job.

Hardy filed a claim with the DOL, alleging that the Association violated the Whistleblowers' Protection Act, *see* RSA 275-E:2, I(a), and requested

"reinstatement to his job on the same terms as set forth in his employment contract, lost back pay and fringe benefits, and attorney's fees and expenses." In May 2005, the hearing officer conducted a "pretext analysis" of the evidence, found in Hardy's favor on the merits and granted the requested relief, except for attorney's fees and expenses, which he concluded he was not authorized to award. The DOL denied Hardy's motion for rehearing, but granted the Association's motion for rehearing on the basis that use of the pretext analysis was inappropriate due to the presence of direct evidence, stating:

> The "pretext" analysis is used if there is *only* circumstantial evidence available. You are correct in your assertion that there was some direct evidence of retaliation, specifically through Jones' testimony. Because of this direct evidence of retaliation, there was not *only* circumstantial evidence available, although there was significantly more circumstantial evidence than there was direct evidence.
>
> The decision utilized the "pretext analysis" when it should have correctly used the "mixed motive analysis".

After an informal prehearing conference, the hearing officer determined that he would not receive new testimony or evidence, but that the parties could submit briefs with regard to the substantive analysis he employed in rendering his original decision. In December 2005, after utilizing the "mixed motive" analysis, the hearing officer issued a second decision finding in Hardy's favor, and granted the requested relief other than attorney's fees and expenses. Hardy filed a timely motion for rehearing, which was denied. The record does not demonstrate that the Association filed a motion for rehearing. Hardy's appeal and the Association's cross-appeal followed.

## II

We first address the Association's cross-appeal. Although neither party raised the issue, the record on appeal does not demonstrate that the Association filed a motion for rehearing subsequent to the DOL's December 2005 decision. The decision's cover letter, dated December 15, 2005, made clear to both parties that:

> Any party aggrieved by this Decision may appeal in the manner specified by RSA 541:3, by applying in writing for a rehearing to the Commissioner of Labor within thirty (30) days of the date of this Decision, specifying fully the grounds upon which it is claimed that the Decision is unlawful or unreasonable.

On December 21, 2005, Hardy timely filed a motion for rehearing, which was denied. On January 12, 2006, the DOL informed both parties that the December 15 decision was now "final." On January 13, 2006, the Association filed its cross-appeal directly with this court.

RSA 541:3 (1997) states, in pertinent part:

> Within 30 days after any order or decision has been made by the commission, any party to the action or proceeding before the commission ... may apply for a rehearing in respect to any matter determined in the action or proceeding, or covered or included in the order, specifying in the motion all grounds for rehearing.

RSA 541:4 (1997), however, states:

> Such motion shall set forth fully every ground upon which it is claimed that the decision or order complained of is unlawful or unreasonable. No appeal from any order or decision of the commission shall be taken unless the appellant *shall* have made application for rehearing as herein provided, and when such application shall have been made, no ground not set forth therein shall be urged, relied on, or given any consideration by the court, unless the court for good cause shown shall allow the appellant to specify additional grounds.

(Emphasis added.) RSA 541:6 (1997) states:

> Within thirty days after the application for a rehearing is denied, or, if the application is granted, then within thirty days after the decision on such rehearing, the applicant may appeal by petition to the supreme court.

Finally, New Hampshire Supreme Court Rule 10(1) states:

> NOTE: To appeal to the supreme court from an administrative agency under RSA 541, the appealing party *must* have timely filed for a rehearing with the administrative agency. *See* RSA 541:4 and *Appeal of White Mountains Education Association*, 125 N.H. 771 (1984).

(Emphasis added.) In *Appeal of White Mountains Education Association*, we held that "[w]hen a decision on any issue is reversed on rehearing, the newly losing party must apply for a further rehearing and satisfy the requirements of RSA 541:4 before appealing to this court." *Appeal of White Mts. Educ. Ass'n*, 125 N.H. at 775.

After oral argument, we ordered the Association to file a brief memorandum addressing whether we should dismiss its cross-appeal on the basis that the record did not demonstrate that it had complied with the requirements of RSA 541:4 and :6, and Supreme Court Rule 10(1). In its memorandum, citing *Appeal of Kruzel*, 143 N.H. 681 (1999), the Association contends that a second motion for rehearing was not necessary under the circumstances of this case. Specifically, the Association argues that "neither the ultimate issue on appeal, whether [Hardy] met his required burden of proof, nor . . . the winning party [was] reversed."

The Association's reliance on *Kruzel* is misplaced. In that case, the petitioning dentist developed carpal tunnel syndrome and ceased his specialty dental practice. The respondent insurance company denied his subsequent claim for workers' compensation benefits. After a DOL hearing officer found that the petitioner was entitled to temporary total disability benefits, the insurance company appealed to the Compensation Appeals Board (CAB). The CAB concluded that the dentist's injury was compensable to some extent, but that he was not totally disabled from gainful employment or from practicing dentistry; he was totally disabled only from his specialty dental practice. *Kruzel*, 143 N.H. at 682-83.

The insurance company filed a motion for rehearing; the dentist also filed a motion for rehearing, requesting the CAB to reconsider its decision that he was not totally disabled from the practice of dentistry. In a second order, the CAB found that the dentist had not produced enough evidence to establish that he was totally disabled from functioning as a dentist. In the dentist's subsequent appeal, the insurance company argued that the appeal should be dismissed because the dentist did not file a second motion for rehearing. *Id.* at 683.

We disagreed, stating:

> The board's initial decision found that the petitioner was not totally disabled from practicing dentistry. The petitioner moved for rehearing, arguing that the uncontroverted medical evidence proved that he was totally disabled from the practice of dentistry. The board's subsequent order affirmed its finding that the petitioner was not totally disabled from practicing dentistry. Thus, the board's decision on this issue was not reversed; nor was the petitioner a newly losing party.

*Id.* at 684. The difference between *Kruzel* and the case at hand is clear. In *Kruzel*, the CAB's second order was equivalent to a rejection of the dentist's reasoning. Had the dentist filed a second motion for rehearing, it would have been identical to his first, with presumably the same result. In the case at hand, however, the DOL agreed with the Association that the

hearing officer should have used the mixed motive analysis and not the pretext analysis. In the subsequent order, the hearing officer rejected his earlier pretext analysis and, based upon the new mixed motive analysis, issued a new decision on the merits. As noted by the Association in its memorandum, "the original decision of the Hearing Officer was reversed on the basis of the analysis to be applied." More correctly, the hearing officer's decision to use the pretext analysis was reversed on rehearing. The fact that the ultimate decision on the merits for Hardy remained the same, in the subsequent order, is not controlling. Following the use of the different analysis, the Association was the newly losing party and Hardy was the newly winning party. The Association should have filed a second motion for rehearing challenging the hearing officer's decision on the merits under the new analysis.

■ Because the Association did not comply with the requirements of RSA 541:4 and :6, and Rule 10(1), we dismiss its cross-appeal on our own motion. *See Appeal of White Mts.*, 125 N.H. at 775 ("when a record does not demonstrate that the appealing party has met the requirements of [RSA 541:4] we will refuse the appeal or dismiss it on our own motion"); *cf. Dziama v. City of Portsmouth*, 140 N.H. 542, 545 (1995) (when board of adjustment's original decision was denial upon merits based upon one issue, and, following rehearing, board admitted error as to that issue but denied petition upon merits based upon new second issue, aggrieved party had to file new motion for rehearing with board to preserve appeal).

Our decision is made in furtherance of the purpose of the statutory scheme and of our rule, specifically that "administrative agencies should have a chance to correct their own alleged mistakes before time is spent appealing from them." *Appeal of White Mts.*, 125 N.H. at 774; *see Dziama*, 140 N.H. at 544 ("board should have the first opportunity to pass upon any alleged errors in its decisions so that the court may have the benefit of the board's judgment in hearing the appeal"). Here, the Association's first motion for rehearing gave the hearing officer the opportunity to correct his alleged error of applying the pretext analysis over the mixed motive analysis. By not filing a second motion for rehearing, however, the Association failed to afford the hearing officer the opportunity to correct his alleged error in the actual application of the mixed motive analysis.

III

In its June 2005 motion for rehearing, the Association argued that the hearing officer erred because: (1) the pretext analysis was inappropriate due to the presence of direct evidence that retaliation played a role in the Association's employment decision; and (2) the direct evidence was

insufficient for Hardy to satisfy his burden of showing that retaliation played a substantial role in the elimination of his position. Because we have dismissed the Association's cross-appeal, we need not address these arguments substantively. We turn to them on a limited basis, however, to clarify the triggering mechanism for the mixed motive analysis under *Appeal of Montplaisir*, 147 N.H. 297, 300 (2001).

We have noted that "the federal standards used to evaluate retaliation claims under Title VII [of the Civil Rights Act] are useful in resolving claims under RSA chapter 275-E. Under federal law, there are two basic ways for an employee to prove retaliation: the 'pretext' approach and the 'mixed motive' approach." *Montplaisir*, 147 N.H. at 300 (quotation and citation omitted). In *Montplaisir*, we outlined in detail the characteristics of, and the burdens under, the two approaches as follows:

> The quality of the evidence determines whether a "pretext" or a "mixed motive" analysis applies. If there is only circumstantial evidence of retaliation, then the "pretext" approach applies. If there is direct evidence of retaliation, then the "mixed motive" approach applies. An employee may proceed simultaneously on both approaches. Based upon the availability or unavailability of the proffered evidence, the hearing officer or trial court channels the case into one approach or the other.
>
> ... Under the "pretext" ... scheme, the employee bears the initial burden of establishing a *prima facie* case of unlawful conduct. To establish a *prima facie* case of retaliation, the employee must demonstrate that: (1) [he] engaged in an act protected by [RSA chapter 275-E]; (2) [he] suffered an employment action proscribed by [RSA chapter 275-E]; and (3) there was a causal connection between the protected act and the proscribed employment action.
>
> Establishing a *prima facie* case of retaliation creates a presumption that the employer unlawfully retaliated against the employee. This presumption places a burden upon the employer to rebut the *prima facie* case — *i.e.*, the burden to produce evidence that the adverse employment action was taken for legitimate, non-retaliatory reasons. The burden placed upon the employer is only a burden of production; the employee retains the burden of persuasion.
>
> If the employer satisfies its burden of production, the presumption raised by the *prima facie* case is rebutted and drops from the case. The employee then has the opportunity to show that the employer's proffered [*sic*] reason was not the true

reason for the adverse employment action and that retaliation was. The employee may do this either indirectly by showing that the employer's stated reasons were not credible, or directly by showing that the adverse employment action was more likely motivated by retaliation. Under the "pretext" approach, the employee retains the ultimate burden of persuading the trier of fact that he or she was the victim of unlawful retaliation.

If the employee produces direct evidence that retaliation played a substantial role in a particular employment decision, then the "mixed motive" approach applies. If the trier of fact believes the employee's direct evidence, the burden of persuasion shifts to the employer to show that despite the retaliatory animus, it would have made the same adverse employment decision for legitimate, non-retaliatory reasons. Evidence is considered to be direct if it consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision. Thus, so long as the employee can meet the evidentiary burden required by the "mixed motive" approach, then the burden of persuasion remains with the employer.

*Id.* at 300-02 (quotations and citations omitted).

After the initial hearing in this case, the hearing officer determined that a pretext analysis was appropriate due to the circumstantial nature of the evidence alleged by Hardy, found that Hardy had established a *prima facie* case of unlawful conduct by the Association and that the Association failed to rebut the presumption of unlawful conduct or retaliation. Agreeing with the Association that, given the presence of some direct evidence, the hearing officer should have applied the mixed motive analysis over the pretext analysis, the DOL granted the Association's motion for rehearing.

In subsequently applying the mixed motive analysis, the hearing officer detailed the direct evidence of retaliation and again found for Hardy. In its now dismissed cross-appeal, the Association contended that the hearing officer misapplied the mixed motive analysis by substituting the absence of a proffered non-retaliatory reason for Hardy's initial burden of showing that the retaliatory reason was a "substantial factor" in the Association's decision to eliminate Hardy's position. *See id.* at 301; *Price Waterhouse v. Hopkins*, 490 U.S. 228, 265, 277-78 (1989) (superseded in part by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e *et seq.*) (O'Connor, J., concurring).

■ If we were to consider the merits of the Association's arguments, and even if we were to assume that the Association was correct in those

arguments, we would still affirm the DOL's finding for Hardy on the merits. Simply because Hardy introduced *some* direct evidence of a retaliatory reason for the elimination of his position does not mean that the hearing officer was necessarily precluded from applying the pretext analysis. The Association's argument is based upon an incomplete reading of our decision in *Montplaisir*. In that case, we stated, "If there is direct evidence of retaliation, then the 'mixed motive approach' applies." *Montplaisir*, 147 N.H. at 300. In amplification of that statement, however, we explained, "If the employee produces *direct evidence that retaliation played a substantial role* in a particular employment decision, then the 'mixed motive' approach applies." *Id.* at 301 (emphasis added). Thus, if Hardy did not produce direct evidence that met the threshold test of playing a *substantial role*, then the mixed motive analysis would not apply.

The Association essentially argues that as soon as *any* direct evidence of retaliation is introduced, the case is channeled into a mixed motive analysis. If that direct evidence does not rise to the level of playing a substantial role, presumably the Association would argue that the claim must be dismissed. The Association has cited no authority, and we know of none, that supports this level of mutual exclusivity of the pretext and mixed motive approaches. Indeed,

> A plaintiff, uncertain of what discovery will yield or how a judge will react to certain proffers, may elect to proceed simultaneously on both fronts (mixed-motive and pretext), cognizant that the trial court, at an appropriate stage of the litigation, will channel the case into one format or the other.

*Fernandes v. Costa Bros. Masonry, Inc.*, 199 F.3d 572, 581 (1st Cir. 1999), *abrogated by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003); *see Montplaisir*, 147 N.H. at 300. The channeling of a case into the mixed motive format occurs, not when there is simply *some* quantity of direct evidence, but when the hearing officer determines there is direct evidence that retaliation played a substantial role in the particular employment decision. Absent that determination, however, the case proceeds under the pretext analysis.

To accept the Association's argument would lead to absurd results. For example, two petitioners file identical whistleblower claims against their mutual employer. Both petitioners produce overwhelming circumstantial evidence and are able to establish a *prima facie* case of retaliation on the part of the employer. In addition, the second petitioner produces a single piece of direct evidence of retaliation, which does not meet the substantial factor test. Under the Association's argument, the first petitioner would meet his burden of persuasion under the pretext analysis and the burden

would shift to the employer to rebut the *prima facie* case. The second petitioner, now forced into a mixed motive analysis by the single piece of direct evidence, would fail to meet his burden of persuasion based exclusively upon that same piece of direct evidence. Consequently, the employer would face no burden, despite the fact that the second petitioner actually produced more overall evidence of retaliation than did the first petitioner. We decline to read *Montplaisir* in a manner that would permit such an absurd result. Such a reading would also ascribe a level of confidence in direct evidence that is not always justified:

> We have often acknowledged the utility of circumstantial evidence in discrimination cases. . . . Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.

*Desert Palace, Inc. v. Costa*, 539 U.S. at 99-100 (quotation omitted).

Finally, we note that the United States Supreme Court has decided that direct evidence is no longer required to trigger a mixed motive analysis in Title VII discrimination cases. *Id.* at 92, 101-02. While we need not decide here if the same should hold true in our resolution of claims under RSA chapter 275-E, we believe the Supreme Court's decision underscores the close interrelationship between the two analyses and undermines the Association's position that the introduction of any direct evidence, without regard to its quality, mandates a mixed motive analysis based solely upon that direct evidence and to the exclusion of a pretext analysis.

IV

We next address Hardy's appeal of the DOL's ruling that RSA 275-E:4, I, does not authorize the award of attorney's fees and expenses. Hardy contends that RSA 275-E:4 authorizes such an award to a prevailing claimant. The Association counters that "[t]here is no mention in [RSA 275-E:4] of a grant of authority to award attorney's fees" and "the power to grant injunctive relief cannot be interpreted to encompass the authority to award attorney's fees, as each is a distinct equitable remedy."

In deciding Hardy's request for reimbursement of attorney's fees and expenses, the DOL construed RSA 275-E:4, I, which reads, in pertinent part:

> [T]he labor commissioner or the designee appointed by such commissioner shall render a judgment on such matter, and shall order, as the commissioner or his designee considers appropriate, reinstatement of the employee, the payment of back pay, fringe

benefits and seniority rights, any appropriate injunctive relief, or any combination of these remedies.

We review the DOL's interpretation of a statute *de novo*. *See Appeal of Franklin Lodge of Elks*, 151 N.H. 565, 567 (2004). In addition, "[q]uestions of law will be resolved in a way which best effectuates the manifest purposes of [RSA chapter 275-E]; namely, to encourage employees to come forward and report violations without fear of losing their jobs and to ensure that as many alleged violations as possible are resolved informally within the workplace." *Appeal of Osram Sylvania*, 142 N.H. 612, 617 (1998) (citations and quotation omitted). Further, "[t]he goal of the remedial provisions of [RSA chapter 275-E] is to ensure that employees are made whole and restored to the position they would have been in absent the employer's unlawful acts." *Id.* at 619 (quotation omitted).

 We agree with Hardy that ordering the reimbursement of attorney's fees and expenses is an appropriate exercise of the DOL's injunctive relief authority under RSA chapter 275-E that effectuates the purposes of the statute. Both *E.D. Swett, Inc. v. New Hampshire Commission for Human Rights*, 124 N.H. 404 (1983), and *Appeal of Bio Energy*, 135 N.H. 517 (1992), support our decision.

In *Swett*, a construction worker filed a charge of racial discrimination in hiring with the commission for human rights against Swett, his former employer. The commission found in favor of the worker and awarded him back pay, compensatory damages and attorney's fees. Neither compensatory damages nor attorney's fees were expressly authorized by the statute at issue. *Swett*, 124 N.H. at 411. The superior court upheld the commission's finding of unlawful discrimination, but set aside the award of both compensatory damages and attorney's fees as being in excess of the commission's statutory powers. *Id.* at 407-08. We upheld the superior court decision with regard to compensatory damages, finding that the varied examples of relief expressly authorized by the statute were equitable in nature, and declining to interpret the statute as encompassing other forms of relief. *Id.* at 411-12. With regard to attorney's fees, however, we held that the statute did empower the commission to award reasonable attorney's fees, in spite of the fact that the statute did not expressly authorize award of the same. We stated that the award of attorney's fees "in appropriate cases is consistent with the discretion granted the commission in fashioning equitable remedies in view of the legislative purpose behind the statute." *Id.* at 412.

In *Bio Energy*, an office coordinator filed a complaint with the DOL, alleging that the employer had terminated her position in violation of RSA chapter 275-E. The DOL agreed and awarded the office worker "injunctive

relief in the form of a mandatory injunction requiring payment of . . . back pay for the time she was unemployed." *Bio Energy*, 135 N.H. at 518. At the time, the statute did not expressly provide for the payment of back pay. *Id.* at 521; *cf.* Laws 1992, 72:1 (amending RSA 275-E:4, I, to include provision for payment of back pay). On appeal, Bio Energy challenged the characterization of the back pay award, arguing that back pay was a form of damages, and not permitted under the terms of RSA 275-E:4, I. In deciding that the award of back pay was properly within the DOL's broad injunctive powers, we stated:

> The purpose of a back pay award is to make a victim of unlawful discrimination whole by putting her in the position she would have been in absent unlawful discrimination. The characterization of the back pay award depends not upon the amount awarded, but upon the purposes that motivated the award. An award of back pay given in the public interest in vindication of public rights is not an award of damages. A victim of discrimination is made whole when she is awarded back pay from the date on which the unlawful discrimination occurred until employment actually begins.
>
> Moreover, the evident purpose of [RSA chapter 275-E] leads us to the conclusion that back pay is an indispensable facet of the DOL's injunctive power. The prospect of several months of unemployment without pay may be just as daunting to an employee as the prospect of losing one's job altogether. If employees are to be encouraged to report illegal acts, they must have assurance that they will not be punished monetarily. Unless an award of back pay is part of the injunctive remedy, any employee who blows the whistle will know that if she is discharged, she will inevitably suffer a substantial period of unemployment without pay since administrative resolution of the dispute will not be settled immediately. Reluctance to suffer such hardship would deter employees from going forward and frustrate the purpose of the [Whistleblowers' Protection] Act.
>
> The lack of a back pay remedy also would weaken the deterrent effect of the Act vis-a-vis employers. Employers would have little incentive to comply with the Act if they faced only the prospect of future reinstatement of an employee. . . .
>
> On the other hand, authorizing the DOL to vindicate public rights by putting a wrongfully discharged employee in the same position she would have been in had the employer acted lawfully furthers the legislative purpose of the Act. An employee is more

likely to report violations if she knows that should she lose her job, she will not only be reinstated, but will also receive back pay. Similarly, an employer is more likely to take pains to comply with the Act if it knows that the DOL can order back pay to the wrongfully discharged employee.

*Bio Energy*, 135 N.H. at 521-22 (citations and quotations omitted).

We believe that these same concerns are present, and the same logic applies, with regard to the reimbursement of attorney's fees and expenses. Hardy will neither be made whole, nor placed in the position he would have been in absent the prohibited employment action, if his legal fees and expenses are not reimbursed. Although RSA 275-E:4, I, now expressly provides for an award of back pay, such an award could prove to be of little significance in the face of mounting attorney's fees, thus negating the remedial purpose of the statute to make the employee whole. *See Osram Sylvania*, 142 N.H. at 619. Such a situation could frustrate the Whistleblowers' Protection Act's purpose of encouraging employees to report violations. *See id.* at 617. In addition, the authority to order reimbursement of attorney's fees and expenses strengthens the statute's deterrent effect as well as the DOL's ability to vindicate public rights. *See Bio Energy*, 135 N.H. at 522.

The Association relies upon our decision in *Appeal of Land Acquisition*, 145 N.H. 492 (2000), to support the denial of attorney's fees and expenses. At issue in *Land Acquisition* was the authority of the New Hampshire Board of Tax and Land Appeals (BTLA) to award attorney's fees in property tax abatement appeals. At that time, the applicable statute, RSA 71-B:9, allowed the BTLA to award "costs" only; there was no mention of attorney's fees. *Land Acquisition*, 145 N.H. at 497; *cf.* Laws 2003, 133:2 (amending RSA 71-B:9 to authorize payment of attorney's fees in addition to costs). We reversed the BTLA's award of attorney's fees and disagreed with the respondent's assertion that the BTLA had the "inherent authority" to award such fees, because of the limiting language of RSA 71-B:9. *Land Acquisition*, 145 N.H. at 498.

The Association's reliance upon *Land Acquisition* is misplaced. RSA 275-E:4, I, authorizes the DOL to award "any appropriate injunctive relief"; RSA 71-B:9 contained no comparable provision. Furthermore, our decision today is not based upon any alleged "inherent authority" of the DOL to award attorney's fees. Instead, we simply construe RSA 275-E:4, I, in the way that best effectuates the manifest purposes of the statute. *See Osram Sylvania*, 142 N.H. at 617.

We reverse the DOL's decision that it lacks authority to award reimbursement of Hardy's attorney's fees and expenses and remand for further proceedings in accordance with this opinion.

> *Cross-appeal dismissed; denial of attorney's fees and expenses reversed; and remanded.*

GALWAY and HICKS, JJ., concurred; DUGGAN, J., with whom DALIANIS, J., joined, concurred in part and dissented in part.

DUGGAN, J., concurring in part and dissenting in part. I concur with the majority's decision to dismiss the Association's cross-appeal and clarify the triggering mechanism for the mixed motive analysis under *Appeal of Montplaisir*, 147 N.H. 297, 300 (2001). I write separately, however, because I would uphold the DOL's ruling that RSA 275-E:4, I (1999) does not authorize the award of attorney's fees and expenses.

RSA 275-E:4, I, provides, in pertinent part:

> [T]he labor commissioner or the designee appointed by such commissioner shall render a judgment on such matter, and shall order, as the commissioner or his designee considers appropriate, reinstatement of the employee, the payment of back pay, fringe benefits and seniority rights, any appropriate injunctive relief, or any combination of these remedies.

The statute does not by its plain language authorize an award of attorney's fees. However, both the petitioner and the majority rely upon two cases to argue that, notwithstanding this omission, the statute nonetheless authorizes an award of attorney's fees. *See Appeal of Bio Energy*, 135 N.H. 517 (1992); *E. D. Swett, Inc. v. N.H. Comm. for Human Rights*, 124 N.H. 404 (1983).

In *E.D. Swett, Inc.*, 124 N.H. at 407, the commission for human rights entered an order against an employer that included back pay, compensatory damages and attorney's fees. The commission relied upon RSA 354-A:9, II (1966), which expressly authorized back pay, but did not expressly authorize either compensatory damages or attorney's fees. *Id.* at 411. The relevant portion of RSA 354-A:9, II (1966) authorized the commission

> to take such affirmative action, including (but not limited to) hiring, reinstatement or upgrading of employees, with or without back pay, restoration to membership in any respondent labor organization, or the extension of full, equal and unsegregated accommodations, advantages, facilities and privileges to all

persons, as in the judgment of the commission will effectuate the purpose of this chapter . . . .

*Id.*

On appeal, we held that the commission could award attorney's fees as "consistent with the discretion granted the commission in fashioning equitable remedies in view of the legislative purpose behind the statute." *Id.* at 412. We refused, however, to hold that the statute authorized the commission to award compensatory damages, stating: "[W]e prefer to await a more express indication from the legislature that its intent is indeed to authorize the commission to award compensatory damages." *Id.*

Unlike the statute at issue in *Swett*, RSA 275-E:4, I, does not contain expansive language authorizing "such affirmative action, including (but not limited to)," nor does it explicitly permit remedies that "will effectuate the purposes of this chapter." Indeed, the language of RSA 275-E:4, I, narrowly restricts the DOL to a list of specific remedies or "any combination of these remedies." Because the authority conferred by RSA 275-E:4, I, is not as broad as that conferred by RSA 354-A:9, II, the *Swett* case does not support the petitioner's argument.

The second case—*Appeal of Bio Energy*—involves the statute at issue in this case, but does not concern attorney's fees. Rather, the issue in *Bio Energy* was whether the statute authorized the DOL to award back pay. *Appeal of Bio Energy*, 135 N.H. at 521. In *Bio Energy*, the court emphasized that RSA 275-E:4, I, authorized "*any* appropriate injunctive relief*," and held that "back pay is an indispensable facet of the DOL's injunctive power." *Id.* The court also noted that "if employees are to be encouraged to report illegal acts, they must have assurance that they will not be punished monetarily," and that "[e]mployers would have little incentive to comply with the Act if they faced only the prospect of future reinstatement of an employee." *Id.* at 522.

The same cannot be said of attorney's fees. Unlike back pay, attorney's fees are not indispensable to the DOL's injunctive power. To construe "any injunctive relief" to include back pay is consistent with the other express remedies in RSA 275-E:4, I, such as reinstatement, fringe benefits and seniority rights. By contrast, to construe "any injunctive relief" to include attorney's fees is to add a remedy that is incongruous with the express remedies and inconsistent with the common understanding of the scope of "injunctive relief."

To be sure, both *Swett* and *Bio Energy* contain broad language concerning the desirability of authorizing administrative agencies to impose a remedy that is not expressly authorized by the statute, because such remedy is "consistent with the discretion granted the commission in

fashioning equitable remedies in view of the legislative purpose behind the statute," *E.D. Swett, Inc.*, 124 N.H. at 412, or "furthers the legislative purpose of the Act," *Appeal of Bio Energy*, 135 N.H. at 522. In my view, however, the test cannot simply be whether the new remedy is consistent with the purpose of the statute, but rather whether a remedy not expressly authorized is "an indispensable fact of [the agency's] injunctive power." *Id.* at 521. Otherwise, in *Swett*, we would have upheld the award of compensatory damages. By broadening the test, we risk creating uncertainty as to the scope of remedies generally available from administrative agencies and infringing on the legislative prerogative to circumscribe the authority of the agencies they create.

For the foregoing reasons, I would uphold the DOL's decision with respect to attorney's fees. Consequently, I respectfully dissent.

DALIANIS, J., joins in the opinion of DUGGAN, J.